Good morning, Your Honor. Again, may it please the Court, my name is Stephon Bowens and I'm here here with me today is my colleague, Attorney Salisha Everhart. We represent the appellants in this matter, Z.G., a six-year-old autistic child, C.G., his mother, and J.G., his father. There are four issues, four main issues, on appeal before the Court today, as noted in the appellant's brief. First, whether the Court below properly dismissed the appellant's claims of I.D.A., A.D.A., and the Rehabilitation Act of 1973, which I typically call R.A., for lack of subject matter jurisdiction when appellants claim exemptions from the administrative exhaustion requirement of the Office of Administrative Hearings in North Carolina. Secondly, whether the lower court abused its discretion by denying appellants leave to amend through a motion filed to file a second amended complaint and by striking the appellant's serve reply to the defendant's response. Third, whether the Court below properly dismissed claims pursuant to 42 U.S.C. 1983 against all defendants. And fourth and finally, whether the Court below properly dismissed the supplemental state law claims of negligent infliction of emotional distress, battery, and false imprisonment. Each of these decisions can be addressed through an analysis of, for example, in this case, of the recent U.S. Supreme Court case in 2017, the decision in Frye versus Napoleon Community Schools, as well as this Court's own decision in 2002 in the case of M.M. X. Rail D.M. versus School District of Greenville County et al., a South Carolina case. First, we look to Frye. It specifies that when the exhaustion rule is required for IDEA claims pursuant to Section 1415 L and other claims based on fate, that the Court must look to the complaint to address whether or not the harms that are identified in the complaint are independent of fate, and whether the denial of fate is a subject of the requirements related to exhaustion in 1415 L. Because in this case, the plaintiff does not only rely on IDEA and the relief that's made available in fate, we believe, as the Court's decision in Frye found at page 754 and 755, demonstrates that this case should be permitted to move forward and should not have been dismissed. Frye also looks at the substance of the case when determining when the and Frye says that the engravement of such an inquiry is found in the pleadings, not necessarily in the labels that are used in the pleadings. So, for example, Frye specifically states, and Justice Keegan specifically stated in the majority opinion, that whether the term fate or free appropriate public education is used in the complaint, it's not the end of the inquiry, but rather what the plaintiff actually alleges in the complaint is determinative. Similar to the Frye analysis, the crux of the issues raised in the lower court relating to the complaint were based on section 42 U.S.C. section 1983, not IDEA, not IDEA. These claims are spelled out in both the 1983 claims and the state law claims that were pendant claims to this matter. So, is there anything that would prevent you from filing a 1983 claim and the state law claims which were not reached today or after you get a decision in this court? I, speaking only for myself, I think your road to hoe to say that you have not exhausted your IDEA claims is difficult. So, what I'm, but I also think that this is appalling fact. So, I guess I'm unclear as to why you wouldn't file state law claims and 1983 claims. And certainly, Limitations hasn't run, has it? No, your honor. It hasn't. And certainly we could. However, we believe that the additional claims and in this case, specifically as it relates to counts one, two, and three, because of the claims that were brought under section 1983, because of the state law claims, because this case was so abhorrent as you've stated, whereby in this case, the principal of the school choked the child or at least, let me give a fair reading of it, caused the child to fall asleep by putting the child in some form of hole. We allege that it's a choke. That all sounds to me like a 1983 claim. Yes. It doesn't really sound like an IDEA claim. And that's what we're arguing. Well, but your problem is you want relief under the IDEA. And what we know about that whole scheme is exhaustion is the name of the game. Unless you meet one of the exceptions. Or unless you meet the narrow exceptions. They are very narrow. And we're happy to go through how we meet those exceptions as well. We believe that district court erred in its analysis of those exceptions. For example, related to the MMX rail factors in the present case regarding whether or not futility was involved. In this case, one of the things that happened was that we had the issues of obviously the 1983 claims that occurred early on. So the first three days of school, the autistic child attempted to elope. And each time, the principal brought him back into the school and then proceeded to place him in a therapeutic hold, which caused him to fall asleep. That's the most generous way of referring to it. This was unbeknownst, not reported to the parent until much later in the year. Well, this law that says the absence of injunctive relief does not constitute futility under the IDEA, right? And the whole underlying process of this IDEA is to have the parents meet with the school and try to come to a resolution. And the possibility of that happening is what keeps most claims from being futile, because you can always do that. You're supposed to do that. That's correct, Your Honor. And in fact, in this case, we did. We actually filed a petition. But you have to keep doing it. Well, we did, but we filed the petition before the Office of Administrative Hearings through the administrative process on September 26, 2015. What happened was that there were continued acts that violated his 1983 rights. We had to redress those rights. And we believe that judicial economy would require us to bring all the claims in the federal district court at one time, not only the injunctive relief, where in this case, what we provided in the record is that an administrative law judge in a similar case occurring at about the same time has stated unequivocally that the court did not have the authority, the administrative law judge did not have the authority to enter an injunction and did not have the authority to stop those specific employees and actors from injuring the child. And he, in fact, went on to say, to avoid counsels going back and forth, filing papers back and forth, I'm telling the plaintiff to seek redress in another court. And that's the AH decision that we provided to the court in our pleadings. Now, along with that, we do not believe, as the court below stated, that when a child is choked or when a child is abused, as in this case, one of the allegations in the petition in the administrative process is pending on November 10th. The child came home from school. Mom was attempting to give the child a bath. When she undressed the child, she noticed bruises on his chest and shoulders. She immediately took the child, under our facts, to the doctor. And while at the local urgent care, the physician assistant not only examined the child, looked at the bruises, and conversed with the child, and the child identified to the medical service provider outside the presence of mom that both Mr. King had pushed him and Mr. Green had injured him. And he told her that during the course of her examination. And we filed because there was a continued abuse by this school. This is the only public school in the county, other than a public charter school, which the parents had already made a complaint before the U.S. Office of Civil Rights for the Department of Education against. That's why they left that kindergarten and came to the public school, the other only remaining public school within the county. So the parents and the child had no recourse. The court was its only recourse. Well, excuse me, counsel, when this was at the hospital and they made that finding, what did the Child Protective Services do? Did they follow up like they would do? They saw a parent who had a child like that. Did they go to the school and say, I want to talk to the person? I'm not aware of that. Interesting. Yeah, they didn't say. There are no facts in the record that there was any follow up. And I must also tell your honor that in this case, we we have not gone through discovery. So this is merely on the pleadings. Well, I'm not talking about discovery. I'm talking about the normal terms of law enforcement. I mean, a parent comes in there with a child like that to be like, OK, come in, look, go in your home and everything. But none of that was done. To my knowledge, that's that's not a part of the record in this case. But looking at your allegations in this case and Mr. Green's conduct, didn't Mr. Green's conduct go to the state law claims rather than the other claims that would be subject to exhaustion? And so how does Mr. Green's conduct serve as an excuse for failing to exhaust? Well, your honor, we we were we were hopeful that not only would we have been permitted to do the second amended complaint, but we would have been permitted to also go through discovery. And at that at that point, we would have amended the complaint to name Mr. Green and Mr. King specifically. But we could not do so without having more information. So having said that, I want to go back to the point to make certain that the court is kind of looks at the timeline. So November 10th, we have the allegation of abuse, a continuing pattern of abuse, which obviously, from our perspective, continuing pattern makes it a pattern and a policy. That's not the stuff of an IDEA claim. That's correct. And what and what we're saying is, though, that the exception, because of the severe harm, it would not only be futile for us to continue through the IDEA claim because these aren't educational issues. If these issues were taken alone outside of the educational setting, would we have a cause of action? And the answer to that is yes. And that's why we fall squarely within FRA. It is also why we fall within the exceptions under the MMXREL case as it relates to futility, severe harm, and the issue of notice. So on November 12th, the school of 2015, the school failed to provide notice to the parents. They would not, when we were scheduled to have a meeting with the school, because counsel appeared with the parent, the school refused to do so. Your Honor, my time is short. I would stand on our brief. I would say to you that the other issues related to the Second Amendment complaint are well briefed in the brief itself, as well as the issue of the cert reply. But I would say to you, as it relates to the cert reply, the Rule 7G1, excuse me, Rule 7.1G specifically states that such replies are discouraged. It does not say that they are not permitted. And in fact, the case that the defendant cite also says that they're discouraged. It doesn't say that they're not allowed. And the point in this case for filing the cert reply was to inform the court of additional case law that it may not have been aware of, that wasn't originally raised until we were able to see their reply, to help inform the court in making the decision. But the court, in this case, chose not to read the reply at all, but assumed that cert replies are not permitted. And that is just not the state of the law. Finally, as it relates to the supplemental claims, those claims in and stop unless the court has additional questions. Thank you, Mr. Bowen. Thank you. Ms. Hitch. May it please the court, Your Honors. My name is Rachel Hitch, and I'm here on behalf of the Pamlico County Schools. I also have with me my co-counsel, Rachel Nicholas. So you have a lot of Rachels in your courtroom today. And then there is also co-defendant's counsel who is going to speak in five minutes of our 20 minutes. Your Honors, I just want to go ahead and address the issue of the exhaustion because that's really where the rubber meets the road on this appeal, in my opinion. And I'm glad that you all were asking about Frey versus Napoleon because I think that Frey versus Napoleon is directly on point. And my arguments that I had at the district court level just got better when Frey versus Napoleon came out. So I want to back up a step two and talk about, just so that we don't have any misunderstanding out there, I think if Your Honors will go back and look at the complaint and the amended... You mean look at them again, you mean? In this case, in this ZG case. Yes, Your Honor. I'm sorry. Again, yeah. Look at them again. I'm sure, Your Honor, that you all have looked at them. But one of the things that has come up is that the facts in which Mr. Bowen relies on heavily in his brief and what you wanted to talk about today, for example, are this, quote unquote, chokehold that he alleges that the principal put the student in. However, if you look at the original complaint and the amended complaint, there is no reference to any chokehold or anything about the student passing out. If you look at the administrative action that was filed, that was not part of what was included. That allegation was first made and was only made, that factual allegation, in appellant's brief. It appears nowhere in their allegations. So for this court to rely on that fact as supporting some sort of injunctive relief that should have taken us out of the exhaustion or futility, they would have to believe that for two and a half years, that fact was out there and never raised in any pleading until the briefs before this court. That could well happen, but your claim is that they waived the futility argument because they think you can really argue it doesn't exist. I mean, you may go into federal court and they have a 1983 claim and you can claim that those facts don't exist, but I don't know that we would need to go there. Sure, Your Honor. So backing up and looking at the legal framework for exhaustion, I think it's also clear from appellant's briefs that they didn't make the argument that the exhaustion analysis was not applicable to the non-IDEA labeled claims. What they argued is applying the exhaustion analysis, that exhaustion would have been futile. That is true, but there's nothing that would prevent them from filing a 1983 claim here or the state law claims that have been reserved today. I think that's true, Your Honor. There's no limitations. There's nothing that prevents that. I think that's true, Your Honor. So looking just at the issue of the futility argument and their argument being the issue of the injunctive relief, a couple things that the court, just to remind the court, which I'm sure you've already noted in your readings, the first is that when this case was filed at the administrative level, there was no injunctive relief sought. So to try to apply a rule that it would have been futile because the court some point later, after this case had already been voluntarily dismissed in the administrative process, that that administrative court some point later made a decision in another case with different facts that the injunctive relief sought in that other case means that it was futile to seek any relief in this administrative case. It cannot stand. And I also just want to point out for Your Honors that that other case in which the ALJ's order was brought into this case later is also Mr. Bowen's and my case. I represented that district as well, and Mr. Bowen's represented that family as well. And so the order of events is that I filed a motion to dismiss the amended complaint in this case in May, and in June, Mr. Bowen's goes to the case that he has pending in front of the administrative law judges in North Carolina and seeks injunctive relief in that case, the one he still has pending that's not related to this case. He gets an order from that ALJ that specifically says that the remedy that Mr. Bowen's was seeking in that other case, that specific injunctive remedy, that the judge could not order that in that case. Well, does that make a difference for purposes of the futility that you couldn't get injunctive relief? I think so, Your Honor. I don't think you can claim that it was futile to go through that administrative process. No, no, no, no, no, no, no. Assume that you can't get injunctive relief in a given case, neither that case or this case or any other case, but some case that's neither one of them. Does that make your IDEA claim futile? No, Your Honor. Why not? It does not make exhaustion futile because the case law talks about the fact that just because you can't get your preferred remedy doesn't mean that you can't get a remedy through the administrative process. So it's not that they have to be able to get the remedies they're seeking. It's that they have to have some redress available to them through that administrative process to continue to have to exhaust that process. No matter what the AOJ said in the other case or this case, it doesn't make any difference. It wouldn't have mattered. Our position, Your Honor, is that it wouldn't have mattered. And you rely on case law that says that. Yes, Your Honor. In our brief, we cite the case law that talks about it doesn't have to be the remedy through the administrative process, then they're required to exhaust. Under the IDEA? Under the IDEA and other claims. That's what I was saying earlier, Your Honor, that he doesn't seem to be disputing that these other claims, the 504, the Rehabilitation Act, and these other claims are also. What about the 1983 claim? So that's a good point, Your Honor, because even at the lower court, the Section 1983 claim was not dismissed on a jurisdictional issue. In other words, it was not dismissed by the district court because of a failure to exhaust administrative remedies, although we made that argument. The district court decided that the failure to exhaust did not cover the portion of the 1983 claim that related to the involuntary commitment and the transportation to the involuntary commitment. However, the court, the district court decided on that claim that the pleadings were insufficient. So the 1983 claim was actually dismissed under B6, not the jurisdictional issue of the exhaustion of administrative remedies. A few minutes ago, I thought you said that there was nothing to prevent them from filing a 1983 claim now, but I guess what you're saying is that claim preclusion would prevent them from doing that. As I work through it, Your Honor, in response to your question, I would say that claim preclusion does. I was thinking in the focus of the exhaustion of administrative remedies. There's nothing about the exhaustion of administrative remedies or failure to exhaust that would preclude that, but the decision of the district court was that though exhaustion doesn't apply to that claim because it's different enough from an IDEA claim, this involuntary commitment claim that they've made, that the reason that they couldn't carry that forward and that that was dismissed is they didn't sufficiently plead under 12B6, that section 1983 claim against the board and Defendant Appellee Jackson, the superintendent. And some of the things that the district court was looking at is there's obviously not a policy, and even if there were, it wouldn't be up to Superintendent Jackson to set the policy or custom in the district, that that would be a board decision and that the superintendent acting on her own could not establish that. What about the claims against the police officers? Your Honor, I'm not addressing the claims against the police officers. Chris Geis will be here to talk to you about the claims against the Sheriff's Department separately. But the court, the district court did carve out that section of the 1983 claims that addresses how the alleged involuntary commitment, the factual allegations about that and what that meant and that those were not precluded by an exhaustion of remedies requirement, but instead that claim was dismissed on the basis that Mr. Bowens didn't sufficiently plead it even in the first amended complaint. In addition, Your Honor, it's worth noting that with regard to the futility, which relies heavily on this injunctive argument that Mr. Bowen makes, is that the complaint itself establishes that had been removed from the school system. So look, when you look at injunctive relief and also even in Mr. Bowen's brief on page 32 of his brief, Mr. Bowen sets out this is the activity we were looking to enjoin that made the exhaustion futile at the administrative level and the activity he's seeking to enjoin is all past activity, which wouldn't have allowed him injunctive relief anyway. So for those reasons, the injunctive relief that plaintiffs say that they were looking for, one, it was never sought, two, they could be required to exhaust their administrative remedies even if the ALJ did not have the authority to award the injunctive relief they were seeking, and three, based on their factual allegations, there's no support in the complaint for any The request, if granted to amend the complaint, impact the 1983, the reasons that it was, for example, to specifically name additional person, would that have an impact on it? No, Your Honor, that's a great question and just a few points about that issue of seeking leave to amend, whether that should have been granted to amend the complaint again. If you'll look in the record, Your Honor, you will see that, first of all, that second amended complaint, when it was presented to me and co-counsel, what was represented to us is that all that was being changed was a clerical error to get the right name for the sheriff's deputy who was involved. It was only upon closer examination at the actual draft second amended complaint that it was clear that Mr. Bellins was seeking to add my client, Lisa Jackson, the superintendent of the school system, individually. But in any event, the district court looked at it and said the addition would be futile based on public official immunity. If she were named in her individual capacity, she would have public official immunity. And that even if you added a line that said that her conduct was shocked the conscience, that the facts could not change, the facts are what they are, and when you read through the facts, the facts would not support that conclusory statement, even if it had been added to a second amended complaint. So because there had been multiple attempts to amend the complaint, and because the amendment that was being proposed was futile, and I would add, because there was even a misrepresentation about what those amendments were looking at, that amendment was not permitted. And that would not change anything. If that second amended complaint, that second amended complaint, the draft, also reflects no reference to all these facts that are so shocking even to this court about the alleged chokehold, passing out, things like that. You won't find that in that second amended complaint. So the second amended complaint would have made no difference on the arguments I'm making to you now. But you agree that the state claims could go supplemental jurisdiction over those state complaints, given that all the federal claims were being dismissed, Your Honor. So I do believe that he could take those claims elsewhere and file them. How does the case get to this point, the school system? I mean, the whole idea of the trap is to educate a child. How did this case get to this incredible facts here like this? And I'll just remind Your Honor that you are required, that the district court was required to take the facts as pled. So we dispute heavily the facts. But the case never reached that point because of insufficient pleading and a failure to exhaust administrative remedies. So that seems to go to the merit of the facts. And what I can say about that, Your Honor, is that. Well, it does. It was, you said it was, what, it was dismissed, right? All the pleadings, right? So you have to accept the pleadings as they are, right? That's right, Your Honor. That's why I'm asking you, how did the facts get to, assuming those to be true, this case, this child who obviously was seemingly in need of incredible services? Young. Yeah, and young. It's a six-year-old kid. Sure. Yeah, but then you're talking about sending him home and put him in a quiet room. What took so long to give him an individualized assessment as to what his needs were, his exceptionalities? Why would that take so long? Well, as you will know in the discussion, that the incidents happened immediately at the start of school. The alleged dates of the issues were at the end of August. I mean, within the second day or third day of school, we were having issues. And so we began the process, Your Honor, and even that's alleged. We began the process of evaluating the student and we did put a Section 504 plan in place for him. And then we were doing the evaluation process, which in North Carolina, the evaluation process under the IDA allows for 90 days from the referral. Doesn't mean you have to take it, but allows for 90 days from the referral to the decision. By the 90 days, the student was gone. By the time that the school system had conducted all the comprehensive evaluations of the student, he was gone. Okay, but what about the prior school year? Didn't you go to school and not do anything at all? Just kept in the office and nothing happened? No, that's a good question. But one of the things that arose, as you heard, he was at a charter school prior to coming to the Pamlico County schools. And so we did not have him the prior school year in our school system. He was in North Carolina. The public charter schools are completely independent of the public, traditional public schools. Your Honor, I see that I have... So North Carolina has no responsibility for children in state-sponsored or certified charter school? Your Honor, I can't speak for the state itself. I can speak for my understanding after 16 years of practicing special ed law. In North Carolina, those public charter schools have their own independent obligation. So if he should have been evaluated the year before, that obligation would have been completely dependent on the charter school. And it would not have been dependent on the county. Well, when was he moved during the kindergarten year? So he left the charter. They filed an OCR complaint against... an Office for Civil Rights complaint against the charter school and left the charter school and enrolled in the Pamlico County schools. Okay, and when did that occur? I would have to double check. In January? Yeah, I believe, Your Honor, that we got word that he was coming before he arrived. So it was the end of that kindergarten year. His parents contacted the Pamlico County schools. And then when we had him enrolled, we started the process of evaluating him. Before the evaluations were done, he was gone. That was in September. So you didn't physically get him until September? I believe, Your Honor, that we got him... I believe we got him at the end of August, September. That started that school year. But in the interest of transparency, I don't want to misrepresent anything. His parents did come at the end of that prior school year and talk to the school system about the fact that he would be coming over and what, you know, what they thought had been the issues at the charter school. And what did you do during the summer to prepare for him? Well, we couldn't prepare for him, Your Honor, until he was enrolled. But once he was enrolled, we began that process. And we had a 504 plan in place. And we were operating off of what we had available to us from the charter school until we had an opportunity to test him and see him ourselves. Thank you, counsel. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, I'm Chris Geis. I represent Sheriff Chris Davis of Pamlico County and the unnamed deputy in this case. Your Honors, there are two actions by the Sheriff's deputies or Sheriff's defendants, as we call them in the brief, that are at issue in this case. The first is a situation where a deputy sheriff was asked by school officials to transport, under the state's involuntary commitment statute, the young child, who was six, because the school officials felt he was a danger to himself and others. The deputy took the child to the hospital and he was involuntarily committed by another law enforcement agency in the town where the hospital is. And the second issue, Your Honor, is the Sheriff's deputies on two occasions delivered some papers from the school officials to the parents of the child. Your Honors, neither of these things involved Sheriff Chris Davis, who is the only Sheriff's defendant who was served in this case and who is technically the only defendant before this Court from the Sheriff's office. And neither amounts to a violation of constitutional rights under the 14th Amendment's Due Process Clause, because these two actions don't shock the conscience. They are not outrageous, they are not egregious, and they were not... Taking a six-year-old to a hospital and having him confined there for, what, two days, three days? That doesn't shock my conscience. Well, Your Honor, the deputy did not commit the child. The deputy transported the child. He made the commitment. He made the commitment possible, didn't he? Your Honor, so did the school officials. But there is a statutory scheme in North Carolina that allows Sheriff's deputies and police officers to commit people, whether they are six or 60, who may be a danger to themselves or others. And the child was evaluated by doctors for two days, so there was something there. What was the basis of the District Court's dismissal of the complaint against your clients? Well, first of all, Your Honor, the District Court found that there were no state law claims asserted against the defendant, the Sheriff's officers. Okay, so today there could be. Well, Your Honor... Limitations hasn't run, has it? No, Your Honor, and that's one of the issues in the case. The plaintiff is free to refile those state law claims against the Sheriff or any Sheriff's deputy in state court. Statute of limitations won't run until next year. The plaintiff hasn't done so. But the District Court found that there were only federal claims asserted against the Sheriff. If the Court agrees with that, then you've just got the two issues, the commitment and the serving of papers. The serving of papers is so trivial that I'm not going to even discuss it. Deputies serve papers all the time in North Carolina. Whether you're offended by a deputy showing up at your house is really not an issue. The issue is whether it violates due process. So the main issue here is whether the deputy's commitment under the Involuntary Commitment Statute or transportation under the Involuntary Commitment Statute violates the conscience or shocks the conscience and violates the child's due process rights. And, Your Honors, that does not. The District Court found that it does not because the deputy was simply acting pursuant to state law. Now, imagine if you were going to say that that shocks the conscience. You are now federalizing or constitutionalizing every commitment in North Carolina, whether it's a six-year-old or a 60-year-old. And the U.S. Supreme Court in County of Sacramento v. Lewis said the Constitution and Section 1983 are not a font of state tort law to be used every time some state official exercises some state authority. There's no indication here nor an allegation by the plaintiff that the statute of involuntary commitment is unconstitutional. And actually, the deputy did not commit the child. He just transported the child. One of the other things in this case, Your Honors, is the plaintiff is not alleged that the deputy did anything that was intended to harm that. Who gave the hospital information about the child? Your Honor, that's not in the record. Okay. But the deputy is simply a courier or a conveyor at who was... Well, obviously, the child didn't arrive at the hospital and just... I don't think there's an allegation that the child was just dumped at the hospital and the hospital decided of its own volition to admit the child. Right. Is there any allegation of that? There's nothing in the complaint, Your Honor, and that's all we have to go by because it's a motion to dismiss. So one would assume that the deputy relayed information from the school officials about how the child was and the deputy is just a conveyor of information here and a transportation conveyor as well. And Your Honors, I see I'm out of time. You can finish your thought. You may finish your thought, Your Honor. Your Honors, as the court said in quoting County of constitutional law, imposing liability whenever someone cloaked with state authority causes harm. We're not conceding that harm existed, but even if it did, the plaintiff is free to file state law claims for whatever battery, assault, intentional infliction of emotional distress against the defendants in state court has not done so. But this is not a constitutional violation. And for these reasons, Your Honors, we ask... And the other reasons laid out in the brief, we ask that the district court's decision be affirmed. Thank you, Mr. Geis. Thank you, sir. Ms. Hitch, the court would ask that you return to the podium. The court has further questions. Ms. Hitch, I'm concerned with your representation that the child came back only at the end of his kindergarten year. I mean, it's very clearly alleged in appendix 66 to 68 that he began attending the school January 2015, that they brought it to the attention of the school officials, that there was a problem. And then on joint appendix 68, paragraph 26, he received no formal special ed services, nor was he officially evaluated, identified, or served as a student with special needs. So it's pretty clear that your representation to us was mistaken. I was mistaken, Your Honor, and I sincerely apologize. What's your analysis of the case? It doesn't change my analysis because I go back to my initial response on that, which is that gets to the merits. That's exactly the kind of thing that an IDEA claim at the administrative level is intended to review. Did we timely find the child? Did we timely evaluate the child? All of those are IDEA claims. But I am very, very sorry, Your Honor, for the mistaken representation about when he started at the school. But it does not get to my question is how we got here. And that's where you sort of, you use that representation to say, oh, we only had him. We didn't have time. We didn't have time. So can you then now, since we've corrected, I accept your apology, January, you had, what happened? What took so long to take care of this kid's needs? Yes, Your Honor. And again, I think that goes to the merits. If we had, if the case had gone forward, we would have responded to that and we would have put forth facts explaining what we were doing during that time, what services he had been provided during that time. And in fact, all of that could have been resolved in January of 2016, almost two and a half years ago. If that administrative case that challenged what we had done since he had been enrolled, had proceeded through the administrative process, there would have been an ALJ decision in January of 2016. And if we had, if we had been derelict in our duties... That's a public process. For example, I'm talking about a school and a child being educated. Did you have an eligibility committee composed to start, for example? I think there are disputed facts about the referral in that... I'm asking you, what about dispute? I used to represent school systems for 14 years when I was counsel, so I'm familiar with the process, very familiar with it. I'm asking you, did you convene an eligibility committee, which normally has a teacher and it's a whole cohort of people all gathered in the circle to educate a child who needs? I'm asking that process, not about lawyers involved in all of that. I'm talking about the child and education. I believe that the record reflects, Your Honor, that there was a referral from a psychologist that was working with the student independently. And I believe that referral came in April of 2015. And that referral was sent via facsimile with her recommendations for a 504 plan. And that came via facsimile over the Easter break. And so what the school system did after that was they never received that fax from his psychologist. So this child wasn't symptomatic at all between January and April? Well... Are you representing that now? No, Your Honor, I am not representing that. I was about to say, because the observation was clear the child had needs way before an outside medical care provider made a referral. That's what your observation is. That's what teachers do every day. They see their students. This child was actively symptomatic, correct? I believe that we had issues, Your Honor, with the student at school. You're putting it mildly in terms of what you represent. Was he sitting with a teacher? What about the silent room and all that? That was just... The notations about the sensory room and things like that were the measures that had been put in place prior to his being evaluated, Your Honor. But I would go back to the issue of it very well may have been, I don't know, Your Honor, we could speculate, but it very well may have been, had they carried out that administrative claim, that the administrative law judge would have said under IDEA that we didn't evaluate him soon enough. And if that would have been the decision, then we would have owed him compensatory time. We would have owed him additional evaluations. We did ultimately evaluate him, but when we evaluated him, we never were able to serve him because he never came back to school. The kindergarten teacher, though, made a referral, did she not? She filled out the documentation. The facts are not specific as to whether that was ever provided. And again, to start a team to review that referral and start a 504 plan, there was a document that was a 504 referral that seemed incomplete. And so how far along that went in the referral process, it's not 100% clear. It's almost as if we're faced with a situation that the less you do, the better off you are. And, you know, that can't really be the law. And I would just say, Your Honor, that schools are not in the business of not educating kids. Schools are in the business of educating children. And even in that whole administrative process exists for times when we maybe should have found them earlier, or maybe we're not giving them all the services they need, or there is a dispute between the kids. It's exactly this kind of dispute is why Congress enacted that administrative process to address these kinds of issues for students. And we would have already known two and a half years ago, whether we were late in evaluating him, what additional services he needed, what we needed to do to remedy that if there had been a violation, what compensatory education might be necessary if he needed a different placement. All of those remedies that are sought first here in federal court, we would have already had all of that resolved two and a half years ago. And how much further along would he be? Okay. Thank you, Your Honor. Debra Hart. Please, the Court. Yes. I want to begin with talking about what you all have been addressing, which is why the ADA claims, the RA claims, and IDEA takes us out of the Office of Administrative and brings us to federal court without having to exhaust our remedies. In this instance, we have a situation where a child was found to not, the school system failed him so severely that it stemmed from the previous school year and the current school, the school year. Nowhere in the pleadings does it talk about when the child was removed out of the school system. No one has talked yet about the failure, the exhaustion prong three or the exhaustion prong two. This argument so far has been limited to the futility argument. The administrative process also does not need to be exhausted when it is shown that it will prove, when it will have a severe harm on the disabled child. It is clear through the facts that have been pled that to exhaust the administrative remedies available would have continued to cause severe harm to the child. And what were those harms? This case has been talked about so much in statutes and cases. What was the harm to this child? The harm to the child is physical abuse. The child was physically abused. The last instance of physical abuse was on November 10th, which is after. And by whom? And that was by his teachers. And there's the physical harms that was experienced in that same school year by the principal of that same school. And that was seen by the superintendent of that school, which is what brings us into 1983. And you named those people specifically? Those, the superintendent was named in her individual capacity. I'm talking about the people who you just told me who did these things to the child. That's in your complaint. They are in the complaint. They are in the complaint. They're not in the complaint. You didn't make them, right? They're, they're in the complaint. Not the one that you wanted to amend, but the one that's there before the court, right? The one that is before the court talks about the individuals who have. And the court said qualified immunity to abuse a child. Is that what you're saying? That's what the district court said? Well, that is what brought us here today, in part, because we do not, we disagree with that assertion. There's also. Maybe you can tell me where in the complaint there's an allegation that exhaustion should be excused because school officials were allegedly physically harming this child. 2E, it is pled that where we talk about the continuing harm. And it is pled generally. Hear my whole question. And then when we go into it, we can talk. We can talk about the unconsciousness in paragraphs 167. I believe also paragraphs around the 50s. There's also some more allegations related to that. The counts also go into it. Okay, but 2E doesn't, 2E talks about futility. It doesn't talk about the danger to the child. The second half of 2E says and, and it discusses. In 2E, if you go to the bottom of paragraph 2E, it begins with futility. And then after there's an and, and. Because plaintiffs cannot obtain adequate relief through the administrative process, including but not limited to the preclusion of the ongoing injuries suffered by plaintiff Zigi in violation of his constitutional right to liberty. And then in the first amended complaint, there's also the additions to where. Right, that's the first amendment. This is the first amendment complaint. It's, it's also in other paragraphs as well. Specifically, I would have to go through and. I mean, it's pretty crucial to you, right? Yeah, paragraph 167 is, talks about the unconsciousness. We also have paragraphs 19, 21, 20. Paragraph 16 is that, and that talks about notice. We have paragraphs 116, 117, and 118. That talks about, that talks more about that as well. Well, I can not do them as quickly as you, but each one I look to does not have what you say it has. Now, I'll look at everyone you say, but this is an important allegation. So, I got it. Okay. Paragraphs 96 through 101 specifically discusses the abuse from November 10, 2015. Paragraphs 93 through 95 discuss him being warehoused in a sensory deprivation room. Paragraphs 108 through 111 also talk about November 10, 2015. Where is that tied to exhaustion? The reason that that's tied into exhaustion. No, no, no. Where in the complaint is it tied to exhaustion? Because the child suffered severe harm at the hands of the school officials. So, when we look at the FRI approach, that is what brings us to not having to exhaust the administrative remedies. And what the complaint does is lay out a recitation of all of the facts and puts in paragraphs 2E, and I believe it's paragraphs 36, all the different ways that the exceptions are met. Through futility, through the harms, through the continuing harms. And what we did is additionally showed what those severe harms were by describing them in individual paragraphs, which are found in paragraphs 96 through 111. And then we have all of the different claims. And why I believe we need to go back to FRI's approach on this matter is because what it talks about is non-educational related injuries. And that is what is really the crux of this case. Because when we look at what the grave man of the complaint is, it is these civil liberty violations. It is the things that are based in 1983. It is the things that even hypothetically, if the administrative process was exhausted because of what types of harms was being, that this student was having to face, his IEP team, the Office of Administrative Hearing, they had no ability to apply remedies to keep these personnels away from him. Now, let me be clear. Your 1983 claim did include the people who you said physically abused this child. It included the superintendent who physically abused the child. Or, I apologize, it included the superintendent who sanctioned the activities of these individuals. But then you left to a respondent superior, and that's, you got to show policy and all those things. Did it include the persons who actually abused the child? That's crucial. I don't know if it specifically alleged those, but what we can... Counselor, you should know that. What we can find, though, in the complaint is a description of everything that happened. And when we look at the amendments to the second amended complaint, by bringing in the superintendent and giving us the opportunity to do discovery to find out specifically how those harms or when those harms were occurring, we would have found more information. But it was dismissed on a 12B1 and 12B6. Yeah, but the problem is, don't you have a situation, as your co-counsel said, that the child actually named someone who was the person who actually... Who did this to the child, correct? Yes, Your Honor. And that was prior to any pleadings filed, correct? Yes, Your Honor. Well, then in 1983, don't you have to name that person? Because it's so difficult to get a person who's just there by virtue of having authority responding superior. It's difficult, unless you can show a pattern and policy and allow the culture and environment for that to occur. Why would you make it so difficult for your case not to specifically plead the people who allegedly did it? And we do have more time, as we've discussed, to bring those 1983 claims. Yeah, but you may have issue in those preclusion issues. You know, it's not just race judicata, but you've got preclusion too. And the issues that we're also talking about is relating it back to IDEA also. And so when we relate all of these issues back to IDEA, when we look at why the complaint was dismissed on the motion to dismiss level, they were talking about them... educational injuries. Not whether or not, you know, certain people were brought in. It wasn't dismissed for not failing to bring in Mr. Green or other defendants. That's not what's before us today. What's before us is a determination as to whether or not these were educational in nature. But it is before us whether or not it was properly dismissed in 1983. That's before us, isn't it? That is before us. And what's also before us are the ADA and the RA and the IDEA. And when it comes to the exhaustion questions, what we have to also look at is whether or not these were educational injuries. And there's a whole line of cases in multiple circuits that discuss when non-educational injuries don't require administrative exhaustion. And that's found in EF et al versus Memphis City Schools. That's a Sixth Circuit decision that talked about verbal, physical, and sexual abuse that occurred. And in that situation, it was found that those were non-educational injuries and the exhaustion requirement would not have to be fulfilled. And so... It was alleged in the complaint that the basis were not exhaustive. And we also alleged and described the instances in the complaint. So the face of the complaint, if we view it in a light most favorable to the plaintiff, it's found on the face of the complaint. All of these allegations are found on the face of the complaint. In paragraph 167, that's where we talk about the child being unconscious. Where, you know, all of the things that are mentioned in the complaint, it's discussed and it's on the face of the pleadings. And if we do take it in a light most favorable to the plaintiff, then we can find what exactly where these issues are and where they are addressed in the complaint. And I believe another point that Frye has addressed is, you know, what we're not looking at is how artfully these things are pled. We're looking at what's the gravement of the complaint. And that is the physical abuse. And that's what takes these ADA claims, these IDEA claims, and these RA claims out of the administrative process and brings those along with other claims that we have. And so we can bring those claims in for that reason. My time is way passed up and I apologize for not... This case is all of them are very important. And you know, we've been asking you questions. So if you want to take 30 seconds or less to state your best closing thought, you may. Thank you. This was the only public school available to a severely autistic child. And what we have are failures to... There is no remedy that he could have... That could have been addressed through the IDEA process. And by taking all of these claims out, what the lower court decided was that all of these things that lead every other instance that happened, he related it back to an educational injury. And this is not the case. These are non-educational injuries. And when we look at Frye, when we look at MMREL, when we look at the case, just the plethora of cases that talk about non-educational related injuries, that is what brings us to revive those cases and keep it back. And just really quick, when we talk about shocking the conscious of the police activities, the statute that is being referred to specifically says that an officer has to have knowledge or get a doctor's order. Those two things did not happen in this case. And when the child was found, he was unconscious and taken from the police department. So every activity that stemmed from what that officer did and what the police department did is a deprivation of his liberty that can be brought through 1983. And with that, that is my time, unless the court has additional questions. There's one thing you said, you said he was taken from the police department unconscious. What did you say? So he was in the complaint. What we talk about is the state of the child when the police took him to escort him to the hospital. And when he's from the school, my apologies. So when he took him from the school, this was when he arrived on the scene, this child was unconscious. He had no knowledge. He was just basing it on the words of the superintendent and the principal. And the requirements of the statute were not met. And in this situation, this shocks the conscious. This is a 60-year-old child. This is an autistic child. He was unconscious when he was found. And then he was taken to be committed. The statute was not followed at all. And the way that it happened was just completely egregious. Just one question, because I apologize for me taking your time now. But it's a key word. You said he was unconscious. And you said he was transported to a medical facility. So that seems to be consistent with being unconscious. But you said he was sent there to be committed. Or was he sent there to be admitted? That's the big difference. I mean, did your pleadings distinguish that action being no, this person's being committed or admitted? It seemed to me, a police officer, that did the right thing. Let's get this child to a hospital to be admitted for medical services. Is there a distinction in your pleadings that this goes to no, he's channeled to commitment as opposed to solely separate from just as anybody would do as a citizen? I mean, if I saw a child unconscious, I'm going to get my private car and zoom him to a hospital. So a police officer can't be at fault for that. So I'm saying, how is it distinguished from that committed versus admitted? I mean, is there a distinction you make in terms of pleading? There was no knowledge that the child was endangered of themselves. But they're unconscious, let alone, I mean, hospital still, right? I'm sorry. Just to answer this question. I'm lucky to have this towel. Really, isn't it? If it's okay with the court, I'll- I just told you it's okay, but I'm limited to just this question. In this instance, what we're saying is that prior to the police were called and were on their way. Right. And the child was, when we say unconscious, he was asleep as a result of the acts of the principal, Principal Dixon. For whatever reason, he's non-responsive. Let's just use that term, non-responsive. Okay. And at that time, when the officer arrived against the objections of the mother, who was also present, the officer took the child. He said, and we quoted in the brief, he said, I'm coming to transport the child. And that implication was he was coming to have the child committed. It was not an admission because the child was sick. Well. I guess. All right. My apologies, Your Honor, for not being able to answer that question more thoroughly. But again, I'm way over my time and I'm thankful to have this opportunity. Thank you. Thank you, Counsel. You want to break? No, I'm okay.  I mean, yeah, no. No, you may not, Counsel. Okay. We're going to come down, greet Counsel, and proceed to our final case for today.
judges: Roger L. Gregory, Diana Gribbon Motz, Barbara Milano Keenan